OPINION OF THE COURT
F. Dana Winslow, J.
Procedural Statement
This action for breach of a commercial real estate lease was tried before the Supreme Court, Nassau County (Honorable E Dana Winslow, J.), without a jury, on September 10-11, 2002. Both sides have submitted posttrial memoranda of law, together with proposed findings of fact and conclusions of law. After due consideration of the parties’ submissions, as well as the trial testimony and documentary evidence admitted at trial, the court hereby makes the following findings of fact and conclusions of law.
Findings of Fact
1. Plaintiff SEEK Associates (SEEE or landlord) is the owner of the premises located at 139-66 35th Avenue, Flushing, New York, which is currently occupied by the Flushing Manor Care Center, a skilled nursing facility licensed under article 28 of the New York Public Health Law.
2. Defendants Esther, Michael and Sharon Benenson (the tenants) are the licensed operators of Flushing Manor and are the tenants of the premises pursuant to a written lease dated February 22, 1973, as subsequently amended.
*759 3. The habendum clause of the lease, as amended, sets forth the amount of rent (the net annual basic rental) to be paid by the tenants as follows: During the first 10-year period thereof, the sum of $542,100 per annum; during the second 10-year period thereof, the sum of $611,600 per annum; and during the third 10-year period thereof, the sum of $672,760 per annum.
4. The habendum clause further provides that, in the event that the rent escalation provisions set forth therein conflict with the rules, regulations or policy of the New York State Department of Health (the Department or DOH), then the increases in net annual basic rental “shall be limited to an amount permitted and allowed for purposes of reimbursement computation by said Department in accordance with its rules, regulations or policy.”
5. The interpretation and effect of the habendum clause was the subject of a 1989 summary proceeding entitled SKEK v Benenson, adjudicated in the Civil Court of the City of New York, County of Queens (Kitzes, J.). In that proceeding, SKEK sought to recover rental arrears allegedly owed since January 1, 1985, when the rent escalation of the second 10-year lease period allegedly took effect. The question presented was whether the rent escalation provisions of the lease were self-executing; i.e., whether such provisions, without more, triggered the tenants’ obligation to pay increased rent upon the commencement of the second and third 10-year periods.
6. Judge Kitzes determined that such rent escalation provisions were not self-executing: the tenants’ obligation to pay the increased rent was contingent upon the tenants receiving an increase in reimbursement from the State. In a decision entered on March 8, 1989 (the Civil Court decision), Judge Kitzes held that “the intention of the parties was to tie the amount of rent to be paid during the initial ten year period to the total amount available for reimbursement from the State, assuming all 278 beds were reimbursable at the rate of $1,950. The periodic increases provided in the lease subsequent to the first ten year period were inserted with the intention of obtaining future increases in the amount of reimbursement from the State based upon the rental increases provided in the lease.” Judge Kitzes found that the parties clearly intended to “tie the rental with reimbursement,” limiting both the initial rent and any subsequent increases to an amount allowed by the State for purposes of reimbursement.
7. From the beginning of the lease to the commencement of this action, the tenants paid $542,100 per year in rent.
*760 8. From the beginning of the lease until 1998, the real property cost reimbursement that the tenants received from the DOH was $542,100 per year. DOH had reimbursed tenants’ facility in accordance with section 86-2.21 (c) (1) of the Commissioner’s Administrative Rules and Regulations (10 NYCRR), which set forth the methodology for capital cost reimbursement of facilities that had entered into arm’s length lease arrangements prior to March 1975. For such facilities, the real property component of the reimbursement rate included factors other than the actual rent expense, namely, amortization of leasehold improvements, associated interest, return on equity and property insurance. The total reimbursement was subject to an arm’s length ceiling limitation, based upon a per bed amount. The arm’s length ceiling applicable to Flushing Manor was $542,100 ($1,950 per bed x 278 beds). Any expenditures in excess of the arm’s length ceiling were not allowed for reimbursement.
9. In October 1998, the DOH announced that expenses related to depreciation and financing of leasehold improvements would no longer be subject to the arm’s length ceiling limitation. Although the “arms length rental ceiling” remained at $542,100, the tenants began to receive reimbursement rate increases reflecting the allowance of additional amounts, in excess of the arm’s length ceiling ($31,808 in 1998 for leasehold improvements; $31,690 in 1999 for leasehold improvements; and $102,659 in 2000 for leasehold improvements, insurance and return on equity).
10. On May 18, 1999, SKEK served notice upon the tenants that the tenants were in breach of the terms and conditions of the lease. SKEK took the position that, by reason of the change in DOH policy, the rent escalation provisions of the lease no longer conflicted with DOH policy, and plaintiff was entitled to receive the full amount of stepped up rent provided in the lease for the second 10-year term, including all additional reimbursement received by tenants in excess of the former arm’s length ceiling. SKEK demanded payment of $396,733.51, warning that a failure to pay within the 10-day cure period would result in an event of default under the lease. The tenants did not tender the amount demanded, and on October 6, 1999, SKEK served further notice that the tenants were in default and had accordingly forfeited their right to renew the lease upon its expiration in January 2000.
11. SKEK commenced the instant action on September 9, 1999. The court refers to the record and to the parties’ posttrial *761 memoranda for a procedural history of the ensuing litigation in this court, the Queens County Supreme Court, and the Appellate Division, Second Department (see 293 AD2d 694; 293 AD2d 737, 293 AD2d 738). As a result of the foregoing, there remains before the court a single cause of action by plaintiff and two counterclaims by defendant. Plaintiffs claim is for recovery of the additional property cost reimbursement (in excess of the former arm’s length ceiling) received by Flushing Manor in 1988 and successive years. Plaintiff also seeks to recover its litigation costs, pursuant to the lease. Defendants counterclaim for a judgment declaring that tenants are in full compliance with the lease and enjoining SEEK from holding them in default. Defendants also seek to recover their litigation expenses based upon plaintiff’s purported breach of a “covenant not to sue” contained in a July 1974 letter signed by one of SKEK’s partners.
Conclusions of Law
I. SEEK is entitled to recover the property cost reimbursement received by tenants in excess of the former arm’s length ceiling.
II. Tenants’ nonpayment of the additional rent demanded by SEEE did not constitute a material breach of the lease, and tenants are entitled to renew the lease retroactively as of February 2000.
III. The record presented is insufficient to support a determination regarding either party’s claim for attorneys’ fees and other litigation costs.
I.
The lease provides for periodic increases in the net annual basic rental. In the Civil Court decision, Judge Kitzes determined that the parties intended to limit the amount of rent payable pursuant to the escalation provisions to an amount that would be reimbursed by the DOH. However, Judge Kitzes did not answer the question now before this court: whether the rent escalation is tied to an increase in the total amount of property cost reimbursement over $542,100 (reflecting an increase in any individual component thereof, such as leasehold improvements or insurance), or whether the rent escalation provision is triggered only by an increase in the amount of reimbursement allocable to rent. Viewed another way, if the DOH reimbursed an amount in excess of $542,100 based upon a greater allowance for rent, it is undisputed that the excess would be payable to *762 SKEK. The question before this court is: when the excess reimbursement (over $542,100) is attributable to leasehold improvements or property costs other than rent, to whom does such excess reimbursement rightly belong?
Defendants argue that the periodic step increases provided in the lease are triggered only by an increase in the amount of reimbursement specifically earmarked for rent — either allocated to rent on the DOH rate sheet, or granted to accommodate the rent increases provided in the lease. Accordingly, in defendants’ view, the post-1998 excess reimbursement allocable to leasehold improvements and property insurance rightly belongs to tenants.
In support of their position, defendants offer a faulty interpretation of the lease and the Civil Court decision. Noting that the lease nowhere refers to “property-related expenses,” defendants argue that the rent escalation provisions are conditioned upon tenants’ receipt of increased reimbursement for “net annual basic rental.” This argument confuses distinct concepts. The habendum clause limits the increases in net annual basic rental (i.e., the amount paid by tenants to landlord) provided for therein, to an amount “permitted and allowed for purposes of reimbursement computation by said Department” (i.e., the amount paid by DOH to tenants). In other words, the lease merely provides that the amount tenants are required to pay to the landlord may not exceed the amount tenants receive from DOH. The lease itself does not specify the category or categories of reimbursement to be considered in the equation.
In essence, defendants contend that the missing specification is supplied by the Civil Court’s interpretation of the habendum clause. Defendants point to the language of the Civil Court decision, quoted in finding 6 above, which recited the intention underlying the rent escalation provisions in the lease, that the parties would apply for future increases in reimbursement based upon such provisions. Defendants interpret this language to mean that the periodic rent increases were contingent upon the DOH approving such future applications, and the additional reimbursement being granted on the basis of the rent escalation provisions, i.e., for the specific purpose of funding such rent increases. According to defendants, the Civil Court decision precludes a rent increase based upon the tenants’ receipt of additional reimbursement by any other process or for any other purpose.
The court disagrees. The language cited above merely describes the intent of the parties to cap the tenants’ rental *763 obligation at the level of DOH reimbursement obtained by the tenants. The Civil Court decision held only that the periodic rent increases could not take effect in the absence of a concomitant increase in DOH reimbursement over and above the current level. It did not specify the nature or manner of reimbursement increase that would activate the step-up provisions. When the decision was rendered, the Department had never provided reimbursement in an amount greater than $542,100. The Civil Court was not faced with, and thus did not determine the effect of, an increase in DOH reimbursement.
Defendants note that SKEK does not seek to recover reimbursement for all property-related expenses. Reimbursement for certain property-related expenses (such as real property tax) paid by defendants to third parties, are not included in plaintiff’s claim. According to defendants, this demonstrates that the lease did not contemplate a rental cap based upon reimbursement for “property-related” expenses, but rather upon reimbursement for rent only. (Neither party argues that the amount of net annual basic rental is tied to reimbursement for operating expenses unrelated to real property costs.)
The court disagrees. From the inception of the lease until 1988, the rent paid pursuant to the lease was equal to the total reimbursement for those property-related expenses set forth on schedule IV of the DOH rate sheet. SKEK’s omission of other property-related reimbursement from its claim is consistent with the fact that such expenses have been treated differently under the DOH reimbursement scheme. They have never been included on schedule IV and thus, the rental cap calculation has never included the reimbursement paid for these expenses. SKEK’s position, that the rental cap is based upon reimbursement for certain property-related expenses (i.e., those listed on schedule IV), is consistent with the parties’ past practices, and cannot be interpreted as grounds for further restricting the concept of “reimbursement” to include only those reimbursements allocated to rent.
More persuasive, but ultimately unconvincing, is defendants’ argument that to pass through the post-1998 additional reimbursement to SKEK would contravene the intent and policy of the DOH. Defendants note that, prior to granting a certificate of need for Flushing Manor, the Department insisted that the lease be amended to reduce the initial net annual basic rental to coincide with the amount of the arm’s length reimbursement ceiling ($542,100). The Department further required *764 defendant Esther Benenson to sign an affidavit stating that she would not sign any modification, amendment or new lease without prior approval from the Department. In 1985, plaintiff and defendants jointly applied to increase the rental reimbursement in order to fund the step increase under the lease, and their application was denied, as was the appeal of the denial. The Department has not specifically approved an increase above the basic rent of $542,100, and has never allocated more than $542,100 to rent on its reimbursement rate sheet.
Defendants argue that the purpose of the 1998 policy change, to allow reimbursement in excess of the arm’s length ceiling for expenses related to leasehold improvements, was to encourage or facilitate nursing home repairs. Pursuant to the lease, which is a “net net” lease, tenants are obligated to pay for all leasehold repairs and improvements. According to defendants, the incentive to make such improvements would be defeated, and the Department’s intent frustrated, by requiring tenants to pass through such additional reimbursement to the landlord. It would be “illogical,” in defendants’ view, to require reimbursement for repairs to be passed on to the landlord when the tenants are required to pay and are paying for such repairs, pursuant to the terms of the lease.
In short, defendants’ argument can be distilled to a single statement: the Department did not intend to fund a rent increase (i.e., to pay landlord); rather, it intended to fund leasehold improvements (i.e., to pay tenants). However, the Department’s intent is not controlling. The parties’ obligations vis-á-vis each other are governed and defined by their contractual agreement to the extent lawful. In delineating the contours of the such agreement, the court must look to the objective intent of the parties, particularly with respect to the allocation of benefits and burdens.
Here, the lease reflects the parties’ intention and agreement that the rent would increase periodically, subject only to the tenants receiving a corresponding increase in reimbursement from the State. The DOH approved the lease, as amended, and thus tacitly approved this agreement. The rental increases sought by plaintiff are a binding term of this lease, and not part of any new or amended lease which would violate defendants’ obligation to DOH.
Judge Kitzes found that, at least in the initial term of the lease, the parties intended to link the amount of rent payable to SEEK to the total amount available for reimbursement from *765 the State. The parties’ course of conduct for the first 23 years of the lease reflects this intent, more particularly, the intent to tie rent levels to the total reimbursement of expenses listed on schedule IV of the DOH rate sheet. From the commencement of the lease until 1998, tenants paid a rental of $542,100, based upon the total property cost reimbursement received from the State, as listed on schedule IV The total amount of reimbursement was calculated on an amount-per-bed basis, and was allocated to various property-related expense categories in addition to rent, including amortization of leasehold improvements, associated interest, return on equity and property insurance. In some years, the amount allocated to rent on the rate sheet was less than $542,100, but tenants nonetheless paid the total amount ($542,100) reimbursed from the State.
In accordance with the parties’ course of conduct, this court finds that the “total amount available for reimbursement,” as used in the Civil Court decision, refers to the sum of the amounts allocated to certain real property and related expenses, as listed in schedule IV of the DOH rate sheet. Judge Kitzes did not explicitly state that, in subsequent lease terms, the rental cap would be based, similarly, upon the total amount of reimbursement. However, the most reasonable interpretation of the habendum clause is that the parties intended to calculate the rent payable in all phases of the lease in a consistent manner. If the rental cap is based upon the total amount available for reimbursement in the initial phases of the lease, than it should be based upon the total amount available for reimbursement in the subsequent phases as well.*
The parties also agreed that tenants would bear the burden of leasehold improvements. A determination in tenants’ favor would shift at least a portion of that burden to the landlord. If tenants were permitted to keep the reimbursement allocated to *766 leasehold improvements and related expenses, then, in effect, tenants would be relieved of this burden at landlord’s expense. To the extent of the reimbursement amount, tenants would pay less for leasehold improvements and landlord would, in effect, pay some of the cost, in the form of a forfeiture of the additional rent provided in the lease. Requiring tenants to pass along the reimbursement to landlord comports with the agreed upon allocation of benefits and burdens as set forth in the lease. The court acknowledges that this may contravene the Department’s intent to encourage leasehold improvement by reimbursing the party that pays the expense. However, neither the parties nor the court is bound by the policy considerations underlying the Department’s reimbursement scheme.
Defendants argue further that plaintiffs claim for additional rent is barred by article VI (c) of the lease, which provides that “the rental of the property will not be increased” in connection with any tenant-financed “changes, alterations and additions.” In defendants’ view, to increase rent by reason of the increased reimbursement paid to tenants for their leasehold improvements would contravene that agreement. The court disagrees. Article VI (c) merely provides that the improvement of the property by tenants will not trigger a rent increase. Here, the claim for additional rent is based upon the rent escalation provision in the lease. The increased rent is triggered, not by the improvement of the property, but by the concurrence of two events: the passage of time and the increase in total reimbursement from the State. The fact that the reimbursement increase is based upon the Department’s decision to increase funding for leasehold improvements is coincidental, and does not bring plaintiffs claim into conflict with article VI (c).
Further, article VI (c) is intended to protect the tenants from a potential double payment — i.e., from paying for the cost of the improvement and then also paying increased rent based upon the improvement. However, requiring tenants to pass through the additional reimbursement would not result in double payment by tenants. Tenants would only be paying for the cost of the improvement, and DOH would be paying the increased rent.
According to testimony adduced at trial, the Department never increases a facility’s property cost reimbursement in order to match a rent escalation provided in a lease. The position advocated by tenants, that the periodic rent increases are contingent upon the Department agreeing to fund them (or otherwise increasing the allocation for rent), could have the ef *767 feet of fixing rent at the initial level for the remainder of the 99-year lease. Defendants do not dispute this proposition, but argue, in effect, that plaintiffs agents are sophisticated business people who are bound by the terms of their agreement. The court cannot believe that the parties agreed to constrict the rent escalation provisions to the point of extinction. A construction of the lease that would allow this result contravenes both equity and the reasonable expectations of the parties.
II.
Article XXXVIII of the lease, as amended, gives tenants the option to renew the lease, so long as, on the date of expiration of the original term (Jan. 31, 2000), the tenants “shall have fully complied with the covenants and conditions on the part of the Tenant to be performed and observed.” Plaintiff argues that the failure of the tenants to pass through to SEEK the additional DOH reimbursement in excess of $542,100 constituted a default in the payment of rent pursuant to the lease, which default remained uncured on the renewal date. Accordingly, plaintiffs contend, tenants never acquired the right to renew the lease. Defendants argue that plaintiff waived the default by failing to commence reentry proceedings and by accepting rent, without reservation of rights, after the expiration of the initial term.
The right of a tenant in possession under an existing lease to exercise an option to renew is an equitable interest that is consistently recognized and protected by the courts. (See J.N.A. Realty Corp. v Cross Bay Chelsea, 42 NY2d 392 [1977].) Where a tenant’s default is immaterial, inadvertent, or otherwise excusable, equity will relieve the tenant from the forfeiture of this valuable leasehold interest, particularly when the tenant has, in good faith, made substantial improvements based upon its intent to renew, and where there is no prejudice to the landlord resulting from the default or the grant of equitable relief. (Id.; see also Restoration Realty Corp. v Robero, 87 AD2d 301 [1982]; 57 E. 54 Realty Corp. v Gay Nineties Realty Corp., 71 Misc 2d 353 [1972].)
In the case at bar, to the extent that tenants’ failure to pay additional rent is now determined to constitute a default under the lease, such default was neither material nor culpable. In 1998 and 1999, the unpaid amount was approximately 5% of the total amount (approximately $31,000 out of a maximum rent payable of approximately $573,000). In 2000, the unpaid amount *768 was approximately 15% (approximately $103,000 out of a maximum rent payable of approximately $643,100). Based upon the ambiguity of the habendum clause, a legitimate question existed as to whether or not landlord was entitled to such amounts under the lease, which question was not addressed by the Civil Court decision, and was not resolved until today. (Cf. Jones v Gianferante, 305 NY 135 [1953] [ambiguity in lease renewal provision excused tenant’s mistake in failing to give timely written notice of renewal].)
Equity dictates that “the gravity of the fault must be compared with the gravity of the hardship.” (J.N.A. Realty Corp. v Cross Bay Chelsea, supra at 399, quoting Graf v Hope Bldg. Corp., 254 NY 1, 13 [1930] [Cardozo, Ch. J., dissenting].) Defendants have shown that they will suffer a substantial forfeiture if they are not permitted to renew the lease. They claim to have spent over $1,700,000 for leasehold improvements and major nursing home equipment since the inception of the lease and over $250,000 in such expenditures since the renewal term began. They have relied upon a right of continued renewal for a period of up to 99 years. In contrast, plaintiff has not shown any way in which it will be prejudiced if the court grants defendants the relief sought.
Citing the Fourth Department in Matter of Birnbaum v Yankee Whaler (75 AD2d 708), plaintiff argues that tenants cannot be relieved of a default relating to the payment of rent in the absence of a showing of fraud, overreaching or other unconscionable conduct on the part of the landlord. The Birnbaum facts are distinguishable in that the Fourth Department found no excuse for the tenant’s persistent failure to pay the full amount of rent due. There was no inadvertent mistake or reasonable reliance upon a course of conduct between the parties. Unlike the case at bar, there was no legitimate dispute as to the amount owed. Nor was there evidence of substantial investment in the property or a potential forfeiture of a long-term lease. The fact that the default in question relates to the payment of rent, as opposed to a failure of timely notice, does not preclude the application of the general equitable principles set forth in J.N.A. Realty Corp. v Cross Bay Chelsea (supra) and its progeny.
The circumstances herein weigh heavily in favor of granting equitable relief to tenants, such that they shall not be required to forfeit their valuable renewal option. In light of this determination, the court need not address the parties’ remaining contentions regarding this matter, including the issue of waiver.
*769 ra.
Plaintiff claims that SEEK is entitled to recover its litigation costs and expenses, including reasonable attorneys’ fees, pursuant to article XXIII of the lease. This claim raises issues regarding the essential nature of this action and the scope of the lease’s indemnification provision that cannot be determined on the record presented herein.
Defendants claim that they are entitled to recover their litigation costs and expenses, including reasonable attorneys’ fees, by reason of the landlord’s breach of a “covenant not to sue” contained in a letter from plaintiffs principal, Sid Esikoff. The record contains scarce details concerning the circumstances of execution of this letter and of the lease amendment, which it allegedly supplements. Given the close proximity of the dates of these documents, the court is unable to determine from the record herein whether or not a merger has occurred which would bar consideration of the Esikoff letter.
Accordingly, both sides are required to provide offers of proof regarding their respective claims for attorneys’ fees, at a conference to be held before the court prior to the submission of judgment herein.
Conclusion
The court has determined that SEEE is entitled to payment of the net annual basic rental provided in the lease to the extent that it does not exceed the total amount of property cost reimbursement (currently set forth on schedule IV of the rate sheet), including amounts related to leasehold improvements and property insurance, received from the Department of Health. Plaintiff is entitled to judgment for the difference between the rent paid and the rent to which it is entitled in accordance with the court’s determination herein. Defendants are entitled to exercise their option to renew the lease retroactively, as of February 2000.

 Tangentially, the court notes that Judge Kitzes linked the rental amount to the total reimbursement, which, he noted, was equal to an amount-per-bed figure multiplied by the number of beds (the arm’s length ceiling). Since 1998, however, the total reimbursement has been allowed to exceed the arm’s length ceiling. This provokes the question of whether consistency is achieved by, or whether Judge Kitzes contemplated, a rental cap based upon the total reimbursement or based upon the arm’s length ceiling. The answer is reflected in the basic principle gleaned from the Civil Court decision: that the parties intended to limit the rent payable (to the landlord), to the amount receivable (from the DOH). When the total reimbursement differs from the arm’s length ceiling, the former is the more accurate reflection of the amount receivable from the DOH, and thus the more appropriate basis for the cap on net annual basic rental.